**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH P. MOFFITT,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:13-1519** |
| **v.** | : | **(JUDGE MANNION)** |
| **TUNKHANNOCK AREA SCHOOL DISTRICT and the TUNKHANNOCK AREA SCHOOL DISTRICT BOARD OF SCHOOL DIRECTORS,** | : : : | |
| **Defendants** | : | |
| | : | |

**MEMORANDUM**

## I.     INTRODUCTION

Presently before the court is the defendants' motion for summary judgment filed by Tunkhannock Area School District (the "District") and the Tunkhannock Area School District Board of Directors (the "Board"). (Doc. 39). The plaintiff, Joseph P. Moffitt, asserted four (4) Constitutional claims, one (1) claim for breach of contract, and one (1) claim for wrongful suspension after the defendants suspended him from his school principal position, without pay, for alleged improper administration of tests to students in the District. (Doc. 25). For the reasons discussed below, the defendants' motion for summary judgment is **GRANTED** in part, and **DENIED** in part.

## II.    BACKGROUND

The plaintiff is a principal in the Tunkhannock Area School District both at Evans Falls Elementary School and Mill City Elementary School. Prior to that, the plaintiff served as vice principal at Tunkhannock Area High School from 2006 to 2009. The plaintiff's supervisors are the District Superintendent, Michael Healey ("Healey"), and the District Assistant Superintendent, Dr. Ann Way ("Way"). The District is required to administer the Pennsylvania System of School Assessment (PSSA), which is a standardized test. Prior to the PSSA test, the District would administer the 4Sight Benchmark Assessment, which created benchmarks for the students. Results from the 4Sight tests described how students were expected to perform on the PSSA if the PSSA were administered on the same day as the 4Sight test.

In October 2011, the District administered the 4Sight exam to its students for the first time online. (Doc. 40-2 at 22-23). The two-day exam consisted of 120 reading and math questions. Several of those questions were open-ended and administered on a split screen, where students would read the question on one side and respond to it on the other side. During the October 2011 administration of the exam, one of the teachers called the plaintiff and told him that she could not figure out how to use the split screen

2

for the open-ended questions. Questions from the prep books for the PSSA test were then used as a substitute. The PSSA prep book questions were purportedly similar to the 4Sight questions. Id. at 24. Prior to substituting the PSSA questions for the 4Sight questions, the plaintiff did not consult with Healey. (Doc. 40-1 at ¶27, Doc. 44 at ¶27). Upon completion of the exams, it was the plaintiff's duty to enter the scores once teachers brought the plaintiff the roster of students with their corresponding scores. In this case, some of the teachers brought the roster with scores to the plaintiff to input in the system, but the plaintiff also admittedly distributed his username and password to teachers to input the scores directly. (Doc. 40-2 at 42-43). The plaintiff repeated this method for the January 2012 exam. (Doc. 40-2 at 41).

On June 7, 2012, the plaintiff's secretary notified the plaintiff that Superintendent Healey wanted to meet with him later that day at 2:30 p.m. (Doc. 40-1 at ¶8). According to the plaintiff, he inquired with his secretary about the purpose of the meeting, but she could not tell him. (Doc. 40-2 at 50). The plaintiff, along with Healey, Way, and the District's attorney, Jeffrey Tucker ("Tucker"), met at Healey's office, and the meeting lasted approximately one to two-and-a-half hours (Doc. 40-2 at 63, Doc. 40-3 at 26, Doc. 40-4 at 33). During the meeting, the District's attorney questioned the

plaintiff about his username and password distribution and the 4Sight test. (Doc. 40-1 at ¶8, Doc. 40-2 at 51, Doc. 44 at ¶8). The plaintiff asked for an attorney during the meeting at least once, and the District's attorney told him that he was not entitled to one. (Doc. 40-1 at ¶9, Doc. 44 at ¶9). There were two breaks, and after the second break, Healey told the plaintiff that he was being suspended. (Doc. 40-1 at ¶15, Doc. 40-2 at 52).

The following morning, on June 8, 2012 around 10 a.m., the plaintiff had a meeting with Healey. In this second meeting, Healey informed the plaintiff that he was suspended without pay indefinitely pending further investigation. (Doc. 25 at 4, Doc. 40 at 9). Approximately one week later, the plaintiff received a letter from Healey notifying him that, as a result of investigations and the June 7, 2012 meeting, there was evidence supporting his termination. (Doc. 1 at 21, Doc. 25 at 4-5). The letter also confirmed the plaintiff's suspension without pay, but with benefits, effective on June 8, 2012 until the School Board held a termination hearing. (Doc. 1 at 21). The letter informed him that he could not step foot on school property or attend any sporting events, even though two of his children were District students. The letter did not describe the charges against him or the evidence purportedly supporting his termination. The plaintiff alleges that, in suspending the plaintiff, Healey

4

was retaliating against the plaintiff for reporting that there was life-threatening mold in one of the school buildings, and that 4Sight testing was simply used as a pretext.

On July 23, 2012, the plaintiff received a letter from the Board President, Robert J. Parry, that notified him that Healey recommended his termination to the Board, described the charges against him, and informed him that a hearing would be held pursuant to 24 P.S. §11-1127. (Doc. 40-6). The letter listed five charges as grounds for his possible termination under 24 P.S. §11-1122: "(1) immorality; (2) incompetency; (3) persistent negligence in the performance of duties; (4) willful neglect of duties; and (5) persistent and willful violation of or failure to comply with school laws of this Commonwealth, including official directives and established policy of the Board of Directors." Id. The letter further states that the Board would determine specifically whether the plaintiff:

1.  Shared District passwords with unauthorized individuals;
2.  Permitted yourself to be impersonated with your knowledge and consent by allowing others to use your username and/or password to input 4Sight scores;
3.  Knowingly failed to properly administer the 4Sight assessment;
4.  Negligently failed to properly administer the 4Sight assessment;
5.  Failed to properly oversee the administration of the 4Sight assessment; and/or
6.  Lied to and/or misled supervisors regarding the administration of the 4Sight assessment.

Id. The first two charges relating to the plaintiff's unauthorized sharing of his password were later dropped. (Doc. 43 at 4, Doc. 44 at ¶3).

Board of Education Solicitor, Frank J. Tunis, Jr. ("Tunis"), presided over three days of hearings on the evenings of September 19, October 24, and November 8, 2012. (Doc. 40-2 at 67-68). The plaintiff attended all hearings and was represented by counsel. On November 16, 2012, the Board's attorney sent the plaintiff a letter stating that the Board rejected the District's recommendation to terminate and that he would be reinstated. (Doc. 1 at 27). Although the Board disagreed with Healey's recommendation, the Board further suspended the plaintiff without pay until reinstatement at the beginning of the next marking period. The plaintiff allegedly went without salary from June 7, 2012 until his reinstatement on January 28, 2013 for a total of 242 days. (Doc. 25 at ¶31).

## III.   PROCEDURAL HISTORY

On June 6, 2013, the plaintiff filed a complaint alleging eight different causes of action against the defendants and requesting compensatory damages, punitive damages, attorney's fees, and other damages. (Doc. 1). On August 19, 2013, the defendants moved to dismiss the complaint pursuant

6

to Fed. R. Civ. P. 12(b)(6). (Doc. 8). The plaintiff submitted an opposing brief on September 16, 2013. (Doc. 15). On December 31, 2013, the court granted the motion in part and denied it in part. (Doc. 22). The plaintiff then submitted an amended complaint on January 16, 2014. (Doc. 25). The plaintiff's amended complaint alleges the following six counts: Counts I & II for violation of plaintiff's due process rights and rights to equal access to justice; Count III for First Amendment retaliation; Count IV for violation of associational rights; Count V for breach of contract; and Count VI for wrongful suspension in violation of public policy. On February 21, 2014, the defendants filed their answer to the plaintiff's amended complaint. (Doc. 28).

At the conclusion of discovery, on October 1, 2014, the defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56, (Doc. 39), followed by a brief in support on October 15, 2014, (Doc. 40), and a statement of material facts on October 16, 2014, (Doc. 41). The plaintiff filed a brief in opposition, (Doc. 43), as well as an answer to the defendants' statement of material facts, (Doc. 44), on October 29, 2014 . The defendants submitted a reply brief on November 12, 2014. (Doc. 45). The plaintiff then filed a surreply brief on November 21, 2014. (Doc. 47).

## IV.   STANDARD OF REVIEW

The defendants' motion for summary judgment is governed by Fed. R. Civ. P. 56(a), which states that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A factual dispute is genuine if a reasonable jury could find for the nonmovant, and is material if it will affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995).

The movant and nonmovant each must point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or show that the other party's evidence does "not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B). The movant can also meet its burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325.

8

The nonmoving party must then "do more than simply show that there is some metaphysical doubt as to material facts." Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to [the nonmovant's] case, and on which [the nonmovant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

## V.    DISCUSSION

As a preliminary matter, the plaintiff cites the incorrect legal standard for summary judgment throughout the opposition brief and instead uses the motion to dismiss standard under Fed. R. Civ. P. 12(b)(6), repeatedly asserting that the complaint sets forth sufficient facts to support a cause of action. See, e.g., Doc. 43 at 14. Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint if the plaintiff fails to state a claim upon which relief can be granted. Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

The entirely distinct standard for summary judgment under Fed. R. Civ. P. 56(a), as described above, requires the movant and nonmovant to go beyond the complaint and each point to particular parts of materials in the record to establish the absence or presence of a genuine dispute, or otherwise demonstrate that the other party's evidence does not establish the absence or presence of a genuine dispute. The plaintiff filed a separate statement of material facts to counter any disputed facts in the defendants' statement of material facts. However, the plaintiff relies heavily on the

allegations in the complaint to oppose the motion for summary judgment, which the Supreme Court deemed improper in Celotex, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). Notwithstanding the plaintiff's error, the court is permitted to consider materials other than those cited by the parties in the record in ruling on a motion for summary judgment, Fed. R. Civ. P. 56(c)(3), considering all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

### A.    Section 1983 & Due Process Claims

To state a claim under §1983, a plaintiff must meet two threshold requirements. A plaintiff must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-331 (1986). If a defendant

fails to act under color of state law when engaged in the alleged misconduct, a civil rights claim under §1983 fails as a matter of jurisdiction, Polk Cnty. v. Dodson, 454 U.S. 312, 315 (1981), and there is no need to determine whether a federal right has been violated. Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982). Liability under §1983 is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or actual knowledge and acquiescence. See Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir.1997) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988) abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 54 (2006)).

In order to establish a due process violation, the plaintiff must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.' " Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ., 574 F.3d 214, 219 (3d Cir. 2009) (quotations omitted). With respect to the second prong, "'due process is flexible and calls for such procedural protections as the particular situation demands.'" Biliski, 574 F.3d at 220 (quoting Gilbert v. Homar, 520 U.S. 924, 930 (1997)). At a minimum, deprivation must "be

preceded by notice and an opportunity for a hearing" under the Supreme Court precedent of Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

The plaintiff claims that the defendants deprived him of procedural due process guaranteed by the Fourteenth Amendment under §1983. Count I alleges that defendants suspended the plaintiff without pay, without notice and a hearing. Count II alleges that the District misrepresented to the Board Public School Code §1122 relating to the causes for termination during one of the hearings, resulting in his suspension without pay.

### 1.   Count I

With respect to the due process claims under Count I, as the court previously held, the plaintiff's suspension was made with the intent to dismiss. (Doc. 21 at 12). In his letter dated June 7, 2012, the Superintendent simultaneously suspended the plaintiff without pay and informed him that a termination hearing would be held, with the suspension remaining in effect until the hearing. (Doc. 1 at 21). Because the plaintiff's suspension was made with intent to dismiss, it is a *de facto* dismissal that must be preceded by the same procedures the Constitution mandates prior to actual dismissal. Gniotek

v. City of Philadelphia, 808 F.2d 241, 244 (3d Cir. 1986).

Prior to termination, Loudermill requires "a pretermination opportunity to respond, coupled with post-termination administrative [or judicial] procedures." Morton v. Beyer, 822 F.2d 364, 367 (3d Cir. 1987) (quoting Loudermill, 470 U.S. at 546). The pretermination hearing, "though necessary, need not be elaborate," and it must at least entail: 1) "oral or written notice of the charges," 2) "an explanation of the employer's evidence," and 3) "an opportunity for the employee to tell his side of the story." Loudermill, 470 U.S. at 545.

The defendants do not contest that the plaintiff had a protected interest in his continued employment and was entitled to procedural due process prior to termination, (Doc. 40 at 5-6), but they argue that there is no genuine issue of material fact as to whether they satisfied due process requirements. Id. at 9. The defendants claim they followed the appropriate procedures by holding what they allege was a Loudermill hearing on June 7, 2012. The plaintiff, on the other hand, argues that the "previously unscheduled" meeting on June 7, 2012 did not constitute a Loudermill hearing. (Doc. 47 at 7). He asserts that he did not learn of the charges until he received the letter from the Board President on July 23, 2012. The plaintiff also argues that he was denied

counsel during the meeting.[1]

The court finds that the plaintiff has satisfied his burden that genuine issues of material fact exist regarding whether the plaintiff was afforded due process under Count I. The plaintiff did not support his argument that counsel was required during the pre-suspension hearing with any case law, nor is the court aware of such case law. Nevertheless, the plaintiff possesses a reasonable basis for arguing there was a lack of notice. Although advance notice is not required, Gniotek, 808 F.2d at 244, "for the informal discussion contemplated by Loudermill to be meaningful, the employee must be apprised of the nature of the charges against him or her before or at the time the hearing begins, Morton, 822 F.2d at 371 (3d Cir. 1987). According to his deposition testimony, the plaintiff was not apprised of the subject matter of the June 7, 2012 meeting in advance, and when he arrived at the meeting, the District's attorney simply began asking him questions. He was not notified of

---

[1]The plaintiff additionally alleges that the Board's attorney was biased at the termination hearings, since he presided at the hearings and at the same time served as counsel for the Board. (Doc. 47 at 4). Because this allegation of bias by the Board's attorney is not contained in the amended complaint, it will not be considered by the court. See Warfield v. SEPTA, 460 F. App'x 127, 132 (3d Cir. 2012) ("A plaintiff may not amend a complaint by raising arguments for the first time in a brief in opposition to a motion for summary judgment").

the charges until forty-two days after the purported Loudermill hearing, through the Board President's July 23, 2012 letter. Notice takes on an elevated importance in cases such as this where the initial meeting is the first instance that the plaintiff was aware of any suspicion of misconduct by him, and where there is nothing in the record indicating a prior history of negative evaluations or incidents involving the plaintiff.

The defendants retort, "[i]t is disingenuous for Plaintiff to claim he was unaware of the charges against him or the reason he was being investigated when he openly admits that the only topics discussed/questioned at the meeting were his administration, or lack thereof, of the 4Sight examination and improper dissemination of his usernames and passwords." (Doc. 40 at 9). Defendants' vague allegation that the above topics were "discussed/questioned" does not support the inference that the defendants explicitly notified the plaintiff of any charges against him and that he was being investigated for possible termination. The plaintiff's recounting that he was "questioned" about certain topics or that those topics were "discussed" is hardly an admission, as the defendants suggest.

In addition, there do not appear to be facts in the record showing there was any explanation of the evidence against the plaintiff. Regardless,

"subsequent presentation of evidence underlying the charges of which the employee is not adequately informed does not satisfy the demands of due process." Morton, 822 F.2d at 371. To the extent that the plaintiff answered questions during the meeting, this did not clearly consist of a meaningful opportunity for the plaintiff to tell his side of the story. As discussed above, there is a genuine issue of fact whether the plaintiff was apprised of the charges against him such that he could provide his account of events and an explanation in an informed manner.

Regardless of whether the court finds the June 7, 2012 meeting constituted a Loudermill hearing, the defendants argue that, under the Supreme Court precedent of Gilbert, extraordinary circumstances existed, excusing pre-deprivation process. In Gilbert, the Supreme Court did not find a procedural violation where the employee, who was a state university policeman, was suspended without pay immediately after being charged with felony drug possession. The Supreme Court recognized "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." Gilbert, 520 U.S. at 930. The defendants additionally note that, following the purported Loudermill hearing, the plaintiff was informed by letter

17

of the charges against him, had three days of termination hearings, and was advised of the Board's decision.

The defendants concede that the instant matter does not involve the filing of criminal changes but assert that "the matters are comparable when considering the severity of the allegations against Plaintiff that he knowingly and willingly falsified test scores, disseminated his confidential passwords and usernames, and failed to act with the appropriate level of integrity required of an elementary school principal." (Doc. 40 at 8). In Gilbert, the import of the filing of criminal charges was that it satisfied the primary purpose of holding a pre-suspension hearing, which is to "assure that there are reasonable grounds to support the suspension without pay." 520 U.S. at 925. Here, the defendants have failed to demonstrate that it was necessary for quick action to be taken, that it would be impractical to hold a hearing prior to suspension, or that there has been assurance up to the level of the formal filing of criminal charges to alleviate the concern that any suspension was unfounded. Moreover, the court notes that nowhere in the July 23, 2012 letter listing out the charges is there a specific charge of falsification of test scores, and that the charges regarding dissemination of usernames and passwords were ultimately dropped. The plaintiff has adduced sufficient evidence to permit a

18

reasonable fact finder to conclude that he was not afforded notice of the charges, an explanation of the employer's evidence, or an opportunity to tell his side of the story. Further, the defendants have failed to adduce sufficient evidence to lead a fact finder to conclude that extraordinary circumstances excused the pre-deprivation requirements above. The motion for summary judgment on Count I for alleged due process violations will be denied.

### 2.    Count II

With respect to the due process claims under Count II, the defendants argue that summary judgment should be granted because the plaintiff could have challenged the alleged mischaracterization of Public School Code §1122, which outlines the permissible causes for termination of a professional employee. (Doc. 45 at 8). The plaintiff argues that this alleged misstatement of law was presented at the close of evidence, and thus he did not have an opportunity to challenge it. (Doc. 47 at 5). The court agrees with the defendants that the plaintiff did have an opportunity to challenge the alleged misstatement at the hearing. Although the District had rested its case, the plaintiff was represented by counsel, who could have raised an objection at the time. Further, the plaintiff has failed to identify in the record evidence

19

supporting his assertions that the modified language had any effect on the

Board's decision to suspend. As such, the motion for summary judgment

regarding the alleged due process violations under Count II will be granted.


### 3.    Board Liability

Finally, the defendants argue that the Board did not have any personal

involvement in the alleged violation of constitutional rights, and thus any

claims against the Board under §1983 should be dismissed or, alternatively,

that claims against the Board should merge into claims against the District.

(Doc. 40 at 4). In McGreevy v. Stroup, 413 F.3d 359, 367-68 (3d Cir. 2005),

the Third Circuit discussed the contours of liability for municipalities and other

local governing bodies:

> In Monell v. Dep't. of Soc. Serv., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that a municipality cannot be held liable under §1983 for the constitutional torts of its employees by virtue of respondeat superior. Instead, a municipality may only be liable for the torts of its employees in one of three ways: First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, Jett v. Dallas Independent School District, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); third, the municipality will be liable if an official

with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

In this case, we need focus only on the third method by which liability may attach. As discussed above, the plaintiff was initially suspended by Healey, a subordinate of the Board since the Superintendent reports to the Board and is appointed or dismissed by a majority vote of the Board. 24 P.S. §§ 5-508, 10-801.[2] The Board declined to follow Healey's recommendation to terminate the plaintiff. However, the court finds that there are sufficient facts in the record to show that the Board ratified Healey's allegedly unconstitutional actions. Following the plaintiff's suspension under Healey, allegedly without notice or a hearing, the Board continued the plaintiff's suspension. The defendants' argument fails.

Relying upon Mitros v. Cooke, 170 F. Supp. 2d 504 (E.D. Pa. 2001), the defendants argue, in the alternative, that claims against the Board should merge into claims against the District. Defendants' reliance is misplaced. In Mitros, the district court denied the individual defendant's motion to dismiss, Neither the District nor the Board is an individual defendant. Hence,

---

[2]The Superintendent also has a seat on the Board but is not allowed to vote. 24 P.S. §10-801.

defendants' alternative argument fares no better.

## B. First Amendment Retaliation

The defendants next argue that the plaintiff has failed to establish a cause of action for retaliation under the First Amendment. The plaintiff claims under Count III of the amended complaint that his raising of the issue of life-threatening mold at one of the schools resulted in the adverse employment actions against him. The Third Circuit follows a three-step, burden-shifting process when evaluating a public employee's claim for First Amendment retaliation. Smith v. Cent. Dauphin Sch. Dist., 355 F. App'x 658, 667 (3d Cir. 2009) (non-precedential opinion). First, the employee must show that "the activity is in fact protected." Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). Second, the employee must show that the protected activity "was a substantial factor in the alleged retaliatory action." Id. (quotation omitted). If these two elements are satisfied, then the burden shifts to the defendant to demonstrate that the "same adverse action would have taken place in the absence of the protected conduct." Id.; see also Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009). The first factor is a question of law, and the second factor is a question of fact. Gorum, 561 F.3d at 184.

The plaintiff testified that he investigated complaints of mold and discovered black mold at the Evans Elementary library in the spring of 2011. He expressed concern to Healey and other members of the administration over air quality issues resulting from mold in the summer of 2011. (Doc. 40-2 at 87-88). He hired a professional company to remove the mold in early December 2011. The plaintiff also testified that at the Board's January 2012 meeting, the bill for the job was questioned, and one week later, teachers started receiving calls about his administration of the 4Sight tests. The plaintiff was suspended on June 12, 2012. The testing administrations at issue occurred in October 2011 and January 2012.

The defendants argue that the plaintiff did not satisfy the first factor because in making statements about mold in the school building, "he did not speak as a citizen regarding a matter of public concern . . . . In other words, his speech/activities did not involve social or political concerns of the community." (Doc. 40 at 10). A public employee's speech addresses a "matter of public concern when it relates to an issue of political, social, or other concern to the community." McGreevy, 413 F.3d at 365 (quotation omitted). Here, the plaintiff argues that he expressed concerns about mold in one of the schools and had taken actions to remove it. (Doc. 43 at 16). Due to health

23

and safety concerns, the presence of mold "is a topic of great concern to the community, especially to those families whose children attend the schools in the district." Smith, 419 F.Supp 2d at 646. Therefore, the plaintiff has satisfied the first factor of his First Amendment retaliation claim.

Regarding the second factor, a plaintiff may establish the requisite causal connection through "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Id. at 668. In the absence of that proof, the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (quotation omitted). The defendants argue that there is no causal connection between the plaintiff's mold disclosure and his suspension. (Doc. 40 at 13). They assert that Healey and Way testified that the suspension only related to the plaintiff's allegedly improper administration of the 4Sight exam and unauthorized distribution of usernames and passwords. In addition, they argue that the plaintiff never raised the issue of mold during the hearings. In the opposition brief, the plaintiff merely states in a conclusory fashion that "[d]efendants violated his First Amendment rights by taking actions adverse

to him as a direct and proximate result of and in retaliation for Plaintiff's exercise of his First Amendment rights." (Doc. 43 at 16).

Viewed in favor of the nonmoving party, or the plaintiff in this case, the facts in the record do not raise an unusually suggestive timeline or demonstrate a pattern of antagonism by the defendants. According to the plaintiff's testimony, the plaintiff expressed concerns about mold during the summer of 2011 and took action to remove the mold in December 2011. The plaintiff was suspended on June 12, 2012. Taking the most recent of plaintiff's actions, approximately one year passed between the plaintiff's alleged protected activity of removing the mold and the allegedly retaliatory action of his suspension. In City of Scranton, 411 F.3d at 133, the Third Circuit declined to decide whether a one-year gap is sufficient to support an inference of retaliation and held that the circumstances of the case could support a slight inference of retaliation. In City of Scranton, police officers brought civil rights actions alleging that the city violated their First Amendment freedom by retaliating against them for their participation in a prior lawsuit against the municipality. The officers had unsuccessfully sought to have an ordinance requiring city employees to reside within the city declared unconstitutional and several of them were later terminated. The Third Circuit

25

found it significant that the officers presented evidence that other city employees, who were not parties to the lawsuit, were permitted to keep their jobs despite the city's knowledge that they were not residents. Moreover, prior to the officers' terminations, no city employee had ever been fired for non-compliance with the residence ordinance.

The circumstances in the instant case do not raise the same specter of impropriety as in City of Scranton. When asked whether he had any direct evidence tying Healey's disciplinary action to the mold issue, plaintiff said he had no evidence, and admitted that this claim was based on speculation over the timing of events. (Doc. 40-2 at 155-56). Even if the defendant's retaliatory actions began with the investigation, as the plaintiff suggests, and the timeline were shortened to one week, the timing, without more, does not present enough evidence to raise a dispute of material fact as to whether the defendants retaliated against the plaintiff for his mold disclosure. The amended complaint alleges that Healey and other Board members criticized the Plaintiff for exposing mold in the school. (Doc. 25 at ¶49). The plaintiff did not put forth specific facts regarding the timing, frequency, or substance of the defendants' criticism toward him after he disclosed the condition. When questioned by the Board's attorney about the allegation during his deposition,

the plaintiff wavered in his responses:

> Q. You have in paragraph 49, superintendent and other members of the Board of School Directors both publicly and internally criticized Plaintiff for exposing the mold. What's that based on? How do you know that Healey and the School Board internally criticized you for exposing the mold? How do you know that?
>
> A. I don't know.
>
> Q. Well, then why did you put it in this complaint? Can you answer that, sir?
>
> A. No.
>
> Q. So as you sit here today, that's not true?
>
> A. Yeah, I would have no way of knowing that.

(Doc. 40-2 at 158). The plaintiff also testified that he did not have a specific recollection of any discussion with the Board regarding mold. Further, Healey testified at his deposition that he did not retaliate against the plaintiff for the mold disclosure. (Doc. 40-3 at 12). The court finds that the plaintiff has failed to sufficiently demonstrate a causal nexus to survive summary judgment. Thus, the plaintiff has not satisfied the second factor of his First Amendment retaliation claim.

We need not go further than the second factor because the plaintiff has not satisfied his burden in demonstrating that the protected activity was a substantial factor in his suspension. However, even if the plaintiff had satisfied

the second factor, he would nonetheless fail to meet his burden under the third factor. If a plaintiff satisfies the first two prongs, the burden then shifts to the government, and "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr, 518 U.S. 668, 675 (1996).

The defendants contend that they would have taken action against the plaintiff regardless of the mold disclosure. (Doc. 40 at 12-13). The defendants point to Healey and Way's deposition testimony that the suspension only concerned improper administration of the 4Sight exam. Moreover, the specific charges listed in the July 23, 2012 notice from the Board against the plaintiff only relate to his alleged misconduct in the exam administrations. The plaintiff has failed to adduce sufficient evidence to permit a fact finder to draw the inference that the defendants impermissibly targeted him for exercising his free speech. Accordingly, the court shall grant the defendants' motion for summary judgment with respect to Count III of the plaintiff's amended complaint for First Amendment retaliation.

## C. Associational Rights

Similar to the three-factor test used above, the Third Circuit follows a burden-shifting process when evaluating a public employee's claim of political discrimination in violation of the First Amendment. To make out a *prima facie* case, that plaintiff must show that "(1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 271 (3d Cir. 2007) (citing Stephens, 122 F.3d at 176). Once the plaintiff makes this demonstration, the defendant may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity. Galli, 490 F.3d at 271.

In the amended complaint, the plaintiff alleges that Dr. Sandra Lane ("Lane"), a Board member, should not have been allowed to vote on his termination due to a bias against the plaintiff stemming from a previous incident. (Doc. 25 at 15). The plaintiff testified that approximately four years ago, he encouraged any persons who complained about the superintendent

29

and the Board to run for election, and Lane was a Board candidate at the time. (Doc. 40-2 at 163-64). According to the plaintiff, Lane possessed a bias against him for encouraging others to run. The defendants argue that the plaintiff failed to establish that any alleged constitutional protected conduct was a substantial or motivating factor in his suspension. (Doc. 40 at 14).

The plaintiff does not respond to the defendants' argument or substantively address his freedom of association claim, which are grounds alone for granting summary judgment in favor of the defendants. An independent review of the record yields the same result. Although the first factor is not at issue, since the school principal position does not require a political affiliation, the plaintiff has not put forth sufficient evidence to support his allegations. When questioned by the Board's attorney during his deposition, the plaintiff testified to the following:

> A. [Lane] said that I was saying negative things about Superintendent Healey, about the School Board, about Dr. Way that it was me that was saying it and it wasn't.
>
> Q. Who did she tell that to?
>
> A. Mr. Healey.
>
> Q. Okay. Sandy Lane was telling Mr. Healey that you were saying bad things about him and the School District?

> A. Correct.
>
> Q. How do you know that?
>
> A. That's what he told me during the time when he suspended me for three days.
>
> Q. What did he tell you?
>
> A. He said that I was badmouthing the District, I was badmouthing him, I was badmouthing Dr. Lane.

(Doc. 40-2 at 164-65). When prompted for details about the negative things that Lane alleged the plaintiff actually said, the plaintiff said he did not recall. (Doc. 40-2 at 86). He also failed to draw a substantial connection between Lane's vote and his actions four years prior. He gave testimony about his conversation with Healey, suggesting that Healey may have acted in response to what Healey had allegedly heard from Lane, but only offers speculation about why Lane voted for his termination. Even if the plaintiff satisfied his initial burden under the factors above, the defendants have nonetheless made a sufficient showing that the same adverse employment actions would have been taken even in the absence of the protected activity. The defendants reiterate that the reasons for the plaintiff's suspension are well-stated in the record and do not relate to the plaintiff's lack of support of Lane, but rather his misconduct in relation to the 4Sight testing. Id. at 15. The court does not find that the plaintiff has raised a genuine issue of material fact regarding his

associational claims and, as such, summary judgment will be granted with respect to Count IV.

### D. Breach of Contract

The defendants also argue that the plaintiff failed to establish a breach of contract claim. According to the plaintiff, Pennsylvania Education Act 93 ("Act 93") created a valid contract between the parties. In 1984, the Public School Code of 1949 was amended by Act 93 to provide for a written Administrator Compensation Plan for school administrators.[3] The plaintiff asserts that he "performed under the contract fully and in good faith at all times," and that the defendants breached the contract by suspending him. (Doc. 43 at 17). Through the alleged breach, the defendants deprived the plaintiff of the salary and benefits that he now claims. The defendants argue that the Act does not serve as an employment contract between the parties. (Doc. 40 at 17). Further, the defendants claim that the Act does not provide a remedy for suspension or termination of employees.

In order to prove a breach of contract, the plaintiff must demonstrate:

---

[3]Act of March 10, 1949, P.L. 30, 24 P.S. §11-1164. Section 1164 was added by the Act of June 29, 1984, P.L. 438.

"(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Corestates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). The parties strongly conflict over the existence of a contract which, according to the plaintiff, was created by statute. Although the existence of a contract is for the court's independent determination, where "a statute is claimed to create a contractual right," the court must "give weight to the construction of the statute by the courts of the state." Phelps v. Bd. of Educ. of Town of W. New York, 300 U.S. 319, 322 (1937); see also Dodge v. Bd. of Educ. of City of Chicago, 302 U.S. 74, 79 (1937). Pennsylvania case law provides little guidance. See Young v. Bethlehem Area Vo-Tech Sch., No. 06-cv-2285, 2007 WL 674617, at *13 (E.D. Pa. Feb. 28, 2007) ("This Court is aware of no case applying Pennsylvania law to decide whether a statute, or something perhaps resembling a statute (such as an Act 93 administrative compensation plan), is a contract.").

Looking to federal case law, in Judge v. Shikellamy Sch. Dist., No. 4:15-CV-0551, 2015 WL 5697220, at *8 (M.D. Pa. Sept. 28, 2015), the district court was confronted with the issue of whether Act 93 specifically created a contract. The court held that the plaintiff's failure to allege the existence of an

employment contract separate and apart from Pennsylvania statutory law was fatal to plaintiff's claim for breach of contract. "Importantly, the existence of a Pennsylvania statute which provides for termination of public school employees only for specific causes does not create a contract between Plaintiff and her employer, the School District." Id.

In Young, 2007 WL 674617, at *13, the district court was also confronted with the issue of whether Act 93 conferred the plaintiff with contractual rights, but the court declined to decide the issue as unnecessary to resolving the pending motion. Citing U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 18 n.14 (1977), the district court acknowledged that "a statute can on occasion be found, as a matter of federal law, to constitute a contract between the governmental entity and some private parties, as has been found in the context of claims asserted under the Contract Clause of the Federal Constitution." In Trust Co., the Supreme Court noted in a footnote that, "[i]n general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." 431 U.S. at 18 n.14. However, the statute at issue in Trust Co. contained explicit statutory language demonstrating a clear intent to create a contract. The statute stated,

"The 2 States covenant and agree with each other and with the holders of any affected bonds." Trust Co., 431 U.S. 1 at 18. (citations omitted); see also State of Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 107 (1938) (holding that the statute at issue purported to bind the school by contract to the payment of retirement annuities).

The court's analysis is in line with Judge. Unlike the statute in Trust Co., here there is no clearly evidenced intent for Act 93 to serve as the District's contractual obligations to the plaintiff. The defendant in Trust Co. did not even contest that the statutory language gave rise to contractual obligations. Although Act 93 prohibits the board from discharging a professional employee without cause, this is "but a regulation of the conduct of the board." Phelps, 300 U.S. at 323. The statute iterates a policy to be pursued by the Board and is not intended to create private contractual or vested rights. See Dodge, 302 U.S. at 79. In the absence of an express contract, the only other way in which plaintiff's breach of contract claim may survive is for the plaintiff to establish an implied contract with the District, which the plaintiff has not plead. Judge, 2015 WL 5697220, at *8 (citing Preobrazhenskaya v. Mercy Hall Infirmary, 71 Fed. App'x. 936, 940 (3d Cir.2003) (non-precedential opinion). Because the plaintiff has failed to put forth facts sufficient to prove a genuine issue as to

the existence of a contract, the court shall grant summary judgment on the plaintiff's claim for breach of contract under Count V.

### E. Wrongful Suspension

The defendants' final argument is that the plaintiff's suspension did not violate public policy. Generally, under Pennsylvania law, there is no cause of action for wrongful termination of at-will employees, but the Pennsylvania Supreme Court has recognized an exception for scenarios in which the termination would result in a violation of "public policy." Danao v. ABM Janitorial Servs., No. 14-cv-6621, 2015 WL 2378644, at *19 (E.D. Pa. May 19, 2015) (citing Shick v. Shirey, 716 A.2d 1231, 1237-1238 (Pa.1998)). This cause of action does not extend to employees who are covered by contract or represented by a union. Danao, 2015 WL 2378644, at *19. "Pennsylvania courts have recognized such public policy exceptions rarely and only where a clear mandate of public policy has been violated." Anh Truong v. Dart Container Corp., No. 09-cv-3348, 2010 WL 4237944, at *6 (E.D. Pa. Oct. 26, 2010); see also Benard v. Washington Cty., 465 F. Supp. 2d 461, 473 (W.D. Pa. 2006). For example, in Shick, the Pennsylvania Supreme Court held that the public policy exception applied for an employee who alleged a retaliatory

discharge for the filing of a workers' compensation claim. 716 A.2d at 1232.

In this case, the plaintiff failed to sufficiently articulate how the defendants violated a clearly mandated public policy. The plaintiff merely contends that he was suspended without due process. The defendants point to the plaintiff's lack of specific evidence supporting his vague theory for wrongful suspension. (Doc. 45 at 12). The plaintiff responds that he provided specific answers during the defendants' discovery to support his claim, without attaching such answers. (Doc. 43 at 17). Moreover, it is not a violation of public policy to suspend an employee for wrongful conduct under 24 P.S. §11-1127, as alleged by the Board. See Anh Truong v. Dart Container Corp., No. 09-cv-3348, 2010 WL 4237944, at *7 (E.D. Pa. Oct. 26, 2010) (stating, "it is not a violation of public policy or Pennsylvania law to terminate an employee for falsification of records with intent to deceive the company"). Accordingly, the court shall grant summary judgment on the plaintiff's claim for wrongful suspension under Count VI.

## VI.   CONCLUSION

Based on the foregoing the court **GRANTS** in part, and **DENIES** in part,

the defendants' motion for summary judgment. The court grants the defendants' motion for summary judgment with respect to all claims except Count I of the amended complaint for infringement of the plaintiff's due process rights. An appropriate order shall follow.

s/ *Malachy E. Mannion*

**MALACHY E. MANNION**

**United States District Judge**

Dated:  February 3, 2016

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1519-02.wpd